**Samuel D. WRIGHT,
Petitioner-Appellant,**

v.

**UNITED STATES of America,
Respondent-Appellee.**

**No. 307, Docket 83–2150.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 1, 1983.

Decided Jan. 24, 1984.

Ramsey Clark, Lawrence W. Schilling, New York City, David S. Golub, Silver, Golub & Sandak, Stamford, Conn., for petitioner-appellant.

L. Kevin Sheridan, Asst. U.S. Atty., E.D. N.Y., Raymond J. Dearie, U.S. Atty., E.D. N.Y., Brooklyn, N.Y., for respondent-appellee.

Before FEINBERG, Chief Judge, and FRIENDLY and PRATT, Circuit Judges.

FRIENDLY, Circuit Judge.

More than five years ago we affirmed the conviction of appellant Samuel D. Wright, onetime chairman of New York City Community School Board 23 and later a New York City councilman, in the District Court for the Eastern District of New York, 559 F.Supp. 1139, for having solicited and received "under color of official right" a payment of $5,000 from Behavioral Research Laboratories, Inc. (BRL), a seller of educational systems and materials, in violation of the Hobbs Act, 18 U.S.C. § 1951, and conspiring to defraud the United States of federal funds granted to the school district in violation of 18 U.S.C. § 371, *United States v. Wright*, 588 F.2d 31 (1978), *cert. denied*, 440 U.S. 917, 99 S.Ct. 1236, 59 L.Ed.2d 467 (1979). Wright was sentenced to three months incarceration, nine months probation and a $5,000 fine.

■ In April, 1980, after having served his prison sentence, Wright, on the last day of his probation term, filed a motion for relief under 28 U.S.C. § 2255 and Fed.R. Crim.P. 33.[1] Pursuant to an informal discovery agreement between Wright's counsel and the office of the United States Attorney and various state and federal Freedom of Information Act requests, Wright obtained a quantity of additional materials which he appended to his motion papers. The Government also filed voluminous opposition papers and affidavits. The district court's opinion states, 559 F.Supp. 1139 at 1142, that "[i]n December of 1982, petitioner's *pro se* request for further discovery was filed, along with what appears to be the final version of petitioner's substantive claims", and that "[s]ince petitioner now appears to have satisfied himself that he has filed sufficient documentary evidence of his claims, his request for a hearing on the merits of his § 2255 motion can now be addressed," *id.* The court denied the request and dismissed the petition. Wright appeals from the order and a later order denying reconsideration.

The district court considered that Wright's claims fell into three distinct categories. These were (1) a claim that the Government suppressed various documents and materials in violation of its constitutional obligations of disclosure under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), (2) a claim that some members of the jury may have been prejudiced against him as a black, and (3) a claim of prosecutorial conflict of interest. With respect to the first two categories, we find

---

**1.** 28 U.S.C. § 2255 reads, in pertinent part, as follows:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

A motion for such relief may be made at any time.

Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing there-

on, determine the issues and make findings of fact and conclusions of law with respect thereto. If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set aside the judgment and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

The Government contended in the district court that Wright could not avail himself of § 2255 since he was no longer in custody at the time he filed the petition. This contention was correctly overruled by the district court, see 559 F.Supp. at 1142 n. 2 and cases there cited, and the Government does not press it here.

nothing that can usefully be added to Judge Neaher's thorough discussion of the facts and the law. We shall therefore limit this opinion to Wright's third point.[2]

Before trial Wright had moved for dismissal of the indictment against him on the ground of a prosecutorial conflict of interest. The motion was supported by an affidavit of Gustave H. Newman, Wright's then attorney. The affidavit alleged that the indictment stemmed from a grand jury presentation begun in late 1976 by Assistant United States Attorney Thomas Puccio into Wright's financial affairs and political activities. It alleged that there had been two previous grand jury investigations of Wright, one under the direction of former Assistant United States Attorney James Druker and another under the direction of Puccio, and that no indictments had been filed; that in 1976 Wright waged a bitterly fought primary campaign against Representative Shirley Chisholm which polarized Brooklyn's black community; that supporters of Representative Chisholm and opponents of Wright actively sought to induce the Brooklyn district attorney or the United States Attorney, David Trager, to launch a prosecution of Wright; and that the latter effort bore fruit for improper reasons. "The impropriety in question" was said to be founded "upon the activist role Mrs. Thomas Puccio, an attorney who we believe is employed in the community by a local federally funded poverty law office, has played as a public activist opposed to the leadership and role occupied by Samuel D. Wright." Jt.App. at 722. The affidavit claimed that

> [a]s a publicly acknowledged opponent of Wright and his programs, her in-put with

a senior member on the United States Attorney's staff, both actually and in appearance, pitted the might and resources of the federal government against Wright for reasons of political and idealogical [sic] differences rather than due to an objective analysis of Wright's conduct.

*Id.* The motion requested *"in camera* judicial review of the prosecution's internal files, in conformity with the holding in *United States v. Berrios,* 501 F.2d 1207 (2d Cir.1974), to insure that prosecutor Puccio and the United States Attorney's Office prosecuted because they believed, in good faith, that federal law was violated, and not by reason of extrinsic and improper input." Jt.App. at 723.

Mr. Trager submitted an opposing affidavit (the 1977 affidavit). This characterized the "chronology of the investigation of Mr. Wright, about which his attorney has no personal knowledge" as "simply the product of somebody's imagination." *Id.* at 631. It said there was no investigation of Mr. Wright in 1973; that Mr. Druker did not join the staff of the United States Attorney's office until the latter part of 1974; that at that time, after becoming United States Attorney, Mr. Trager had created an Official Corruption Unit and appointed Druker to head it; and that, due to the pendency of other investigations, it was not until some time in 1975 that evidence with respect to the charges made in the indictment was presented. The affidavit went on in a manner set forth in the margin.[3]

On March 28, 1978, the district court denied the motion to dismiss the indict-

---

2. Our view that the district court properly rejected Wright's claims relating to juror prejudice and *Brady* violations in turn requires acceptance of its dismissal of his Rule 33 motion. Wright's conflict of interest claim relates only to proceedings before the grand jury, and as such, has nothing to do with occurrences at trial—the touchstone of a Rule 33 motion.

3. Mr. Druker did not conclude, contrary to the defendant's claim, that "no evidence of criminality was found relating to Wright's School Board activities" (Newman Aff. p. 3). Indeed, in a memorandum describing the

progress of the investigation of all of the allegations against the defendant, which Mr. Druker prepared in June, 1976, prior to resigning as an Assistant United States Attorney, he described as "specious" the defendant's claim that the payment he received from B.R.L. was for a speaking engagement, and he advised me that "the evidence is quite clear that, as part of an intensive effort to secure District 23's business, Samuel D. Wright was given $5,000 by B.R.L. officials." It was because of this conclusion and my own feeling that the defendant could not possibly com-

ment, rejecting the argument with respect to prosecutorial conflict of interest "[o]n the basis of the representations made by the United States Attorney, and in light of the report by the Attorney General and the Counsel on Professional Responsibility."

This court affirmed, saying:

mand $5,500 as an "honorarium", that I decided to continue the investigation and assign it to assistant United States Attorneys Thomas P. Puccio and Victor J. Rocco.

The decision to reassign the case to Messrs. Puccio and Rocco was made on my own initiative, after consultation with my Chief Assistant, Edward R. Korman. Mr. Puccio did not suggest that the investigation be continued, nor did he ask to be assigned to it. The reassignment had nothing to do with the defendant's challenge to Shirley Chisholm's bid for renomination. Of course, the indictment itself came months after the conclusion of the primary election.

The defendant's motion thus boils down to the claim that this indictment should be dismissed because the wife of one of the Assistant United States Attorneys, who worked on the investigation, was associated—as a junior attorney—with the Brownsville Office of the Brooklyn Community Legal Services Corp., which provided legal representation to groups "which actively worked and campaigned against Councilman Wright in his quest for public office (such as when he successfully contended against U.S. Representative Shirley Chisholm's bid for renomination, when he sought election to the local school board and when a Wright-supported slate [sought election to the local school board] )" (Memo. p. 30).

Although the description of Mrs. Puccio's association with the Brownsville Office of the Brooklyn Community Legal Services fails to take account of the fact that she left that office almost two years before the indictment, and a year before the Wright-Chisholm primary,[*] the suggestion that he was indicted because of Mrs. Puccio's influence on her husband is simply ludicrous. "[T]he discretionary determination to prosecute" (Def. Memo. p. 31) was made by me solely on the basis of the evidence, which I, and my Chief Assistant, thoroughly reviewed. It had nothing whatever to do with any desire by me to align myself with any particular faction opposed to Mr. Wright.

Moreover, the indictment of the defendant was delayed until the Counsel on Professional Responsibility of the Department of Justice investigated the claims which Mr. Wright now asserts. The Counsel, who is responsible solely to the Attorney General and investigates claims of impropriety made against Department of Justice personnel, concluded that the allegations were without merit. Indeed, the defendant was so advised on March 30, 1977, in a letter from Attorney General Bell, which reads as follows (Exh. F infra):

This is in reference to your letter of March 2, 1977, which alleged certain improprieties in an on-going investigation being conducted by a grand jury sitting in the Eastern District of New York.

A complete review of that investigation was undertaken by the Counsel on Professional Responsibility who reports directly to me and who has the responsibility for investigating complaints of misconduct by Department of Justice personnel. The Counsel concluded that the investigation has been conducted in a thorough and professional manner, under the direct supervision of the United States Attorney, and that it should continue to proceed in that fashion.

If you have other complaints against Departmental employees, I would appreciate your having your attorney communicate them directly to the Counsel on Professional Responsibility.[**]

Only after the Attorney General himself advised the defendant that the investigation should proceed was the indictment returned. [*] I am advised that: Mrs. Puccio, whose name is Carol Ziegler, graduated from N.Y.U. Law School in June 1973 and joined the Brownsville Office in September, 1973, prior to her admission to the New York Bar in March, 1974, and after Mr. Wright was elected to membership on Local Board No. 23. She left the Brownsville Office in 1975, approximately two years before the indictment was returned in this case, and long before Mr. Wright "contested United States Representative Shirley Chisholm's bid for renomination." She was not personally involved in any election campaign against the defendant, and whatever role she did play while in the Brownsville office was in her capacity as an attorney employed by the Brooklyn Community Legal Services Corp.

[**] The last paragraph of the Attorney General's letter referred to the fact that the defendant, who was then represented by one of the ablest criminal trial lawyers in New York City, thought that the best way to stop his impending indictment was to go by himself to see a member of the White House staff, who had no responsibilities whatever in this area, and seek her intervention.

Jt.App. at 632–35.

The district court properly rejected Wright's claim that the prosecution against him was biased because the wife of the Assistant United States Attorney who presented this case to the grand jury was allegedly a political opponent of Wright. The Justice Department's Coun-

sel on Professional Responsibility reviewed the investigation and concluded that there had been no misconduct. We agree that no showing of bias of the prosecutor was made here. The American Bar Association Standards Relating to the Prosecution Function, § 1.2, provides that "A conflict of interest may arise when, for example, ... a business partner or associate or a relative has any interest in a criminal case, either as a complaining witness, a party or as counsel." None of these circumstances was present here. We find no impropriety or appearance of impropriety.

588 F.2d at 39.

It now develops that the issue was not so simple as this court believed in 1978. The new material submitted in support of Wright's § 2255 petition went beyond what was then before us in three important respects:

(1) The anti-Wright activities of Mrs. Puccio, the former Carol Ziegler, were not merely those of "a political opponent" of Wright. Early in 1974 Puccio reported to the FBI that Ms. Ziegler, then an attorney in the Brownsville office of the Brooklyn Legal Services Corporation, submitted a report to him, prepared under the auspices of the Community Action for Legal Services Incorporated, a project which was federally funded by the Office of Economic Opportunity, alleging a misapplication of Title I funds by Wright and School Board 23.[4] He said that a grand jury had been impaneled and that he would be willing to prosecute under 18 U.S.C. §§ 1001 and 371 if the allegations were proved. On March 15, 1974, when interviewed by the FBI, Ms. Ziegler said she had written many informal letters to various local, state and federal agencies, and that she and her office would be willing to contact any potential witnesses or aid the FBI in any manner during the investigation of Local School Board 23. She was interviewed again on April 1, 1974. Most of this interview concerned a meeting

of Local School Board 23 on March 28, 1974, to elect a successor to Wright, who had been obliged to resign as chairman because of his election to the New York City Council. She said the meeting had become unruly; that three members started to leave the meeting; and that when she went to the platform in an effort to prevent this, another member grabbed her by the neck to force her to leave. She then described another violent episode to which she was merely a spectator. The FBI discussed this with Puccio, who had another meeting on April 4 with Ziegler, FBI agents and members of parent organizations. Puccio advised that he would have grand jury subpoenas issued and that any further incidents might therefore constitute obstructions of justice.

On July 24, 1975, Ms. Ziegler and Arnold Rothbaum of the Williamsburg Neighborhood Legal Services sent a letter to the Voting Rights Section of the Civil Rights Division of the Department of Justice complaining of irregularities in the community school board election on May 6, 1975. An FBI report dated August 21, 1975, records that Puccio had advised that while his office had not initiated an investigation of the election, he "was aware of the Department's interest in this election and furthermore was also cognizant of the complainants since the complainants had also contacted his office." Jt.App. at 699. On December 18, Ziegler and Rothbaum wrote a seven page letter to the New York City Board of Education detailing alleged acts of misconduct by School Board 23 going back to 1971.

(2) The material before the district court in 1977 and this court on appeal did not characterize the position of Assistant United States Attorney Druker with complete accuracy. An FBI memorandum entitled "Samuel Wright et al.—Fraud against the Government" records that on April 20, 1976, Druker advised "he would decline prosecution in this matter" and "that the

---

**4.** This appears to have been Ms. Ziegler's first acquaintance with Puccio whom she was to marry on May 23, 1976.

facts developed in this matter lack prosecutive merit in Federal Court." Jt.App. at 405. On June 7 Druker submitted a long memorandum to United States Attorney Trager on the subject of "School District 23 Allegations." Addressing himself to the $5,000 payment by BRL to Wright, he said:

> While District 23 appears to have disregarded City Bidding Regulations in the aforesaid purchases, there appears to be no conduct violative of federal law. However, the evidence is quite clear that, as part of an intensive effort to secure District 23's business, Samuel D. Wright was given $5000 by BRL officials for a specious speaking engagement. It is the writer's belief that the evidence of same should be referred to the Kings County District Attorney for consideration in light of New York State's Penal Law which, inter alia, makes it a misdemeanor for a public official to accept gratuities under such circumstances.

Jt.App. at 943. It was after this that the United States Attorney reassigned the matter to Puccio, who had recently married Ms. Ziegler. Puccio, on August 17, 1976, impaneled a new grand jury which ultimately returned the instant indictment on April 1, 1977.

(3) The investigation by the Counsel on Professional Responsibility of the Department of Justice, on which the district court and this court placed such reliance, was perfunctory and the exonerating letter from the Attorney General was Trager's own draft except that the latter was shortened by omitting paragraphs which referred to Wright's reluctance to cooperate with the U.S. Attorney's investigation of his alleged receipt of an illegal bribe and Wright's seeking intervention on his behalf of a member of the White House staff. All that occurred was a meeting on March 16, 1977, in Brooklyn between Michael Shaheen, Jr., counsel for the Office of Professional Responsibility, and Steven Blackhurst, its assistant counsel, on the one hand, and Trager, his deputy, Korman, Puccio, and Puccio's assistant, Rocco, on the other. According to a memorandum by Blackhurst, Trager said that he had insisted that Puccio handle the Wright investigation and had done so with full knowledge of Mrs. Puccio's prior activities against Wright. Puccio added that "his wife's activities in opposition to Wright were minimal and that she had not had anything to do with school board politics for some time (at least one year)." Trager was asked "to draft a proposed response to Wright's letter for the DAG's signature." Jt.App. at 339. In forwarding the draft Trager reaffirmed that the decision to have Puccio "assigned to review the investigation that had previously been undertaken into the subject of the present inquiry was solely my own"; that "[i]n choosing Mr. Puccio to make this review, I was well aware of his wife's prior association, in the capacity of an anti-poverty lawyer, with some of Mr. Wright's political opponents", *id.* at 944; that Puccio did not initiate the investigation or the review and that Trager did not consult with him in making the decision; that, anticipating the charges now being made, Puccio was reluctant to undertake the case and that it took some urging on Trager's part to convince him; that despite this concern, Trager chose Puccio because of his belief that in a case of this significance "I had to go 'with my best' " and that of all his assistants Puccio had the most experience in "conducting complicated investigations of this kind." *Id.* at 945. The letter, drafted by Trager and signed by Attorney General Bell, said that "[a] complete review of [the grand jury's] investigation was undertaken by the Counsel on Professional Responsibility", which had concluded "that the investigation has been conducted in a thorough and professional manner, under the direct supervision of the United States Attorney." *Id.* at 340.

The district court held that the new evidence presented by Wright "provides no reason for this Court to question either the statements of Mr. Trager, or the findings of the Justice Department." 559 F.Supp. at 1152. The court seemed to regard as dispositive that there was still no evidence that Mrs. Puccio "was 'a complaining witness' within the meaning of the ABA stan-

dards cited by the Court of Appeals" since none of the documents indicates that she was the source of the interest of the United States Attorney's office in the BRL payments, and thus no "evidence ... support[s] even an inference of bias under the ABA standards." *Id.* at 1152–53.

## DISCUSSION

■ We agree with appellant that the district court took too limited a view of the issue raised by him. The ABA Standards cited the relative of a complaining witness only as one example of a prosecutorial conflict of interest. Evidently the ABA considered the examples to be confusing since the current version, ABA Standards for Criminal Justice § 3–1.2 (2d ed. 1980), says simply that "[a] prosecutor should avoid the appearance or reality of a conflict of interest with respect to official duties."[5] We find it hard to deny that the decision, after one grand jury investigation of the BRL transaction had terminated without the prosecutor's seeking an indictment, to assign Wright's case for further investigation to a prosecutor whose wife was not merely a political opponent of Wright's but a lawyer who had on two occasions brought complaints to federal authorities that could have resulted in criminal charges against him, who had actively petitioned various federal, state and local agencies to investigate Wright's alleged misdeeds, who had allegedly been assaulted by Wright's minions, and who almost certainly harbored personal animosity against Wright, created an appearance of impropriety.[6] Indeed,

Puccio himself seems to have thought that it would. While we have no basis to question Trager's statements that he decided to make the assignment and that Puccio resisted, this is irrelevant to the appearance of impropriety. The United States Attorney did not sufficiently consider this when he decided to "go with [his] best." Puccio may have been the "best" for other cases but certainly not for this one. It would have been far better to have a slightly less effective prosecutor—if, in fact, such a choice had to be made—not married to a woman who had twice notified federal authorities of activities of Wright's in connection with School Board 23, other than those here at issue, that could have resulted in his indictment.

■ Whether Wright's conviction should have been reversed and the indictment dismissed or at least there should have been a remand for an evidentiary hearing, if the facts now established by him had been before us on his direct appeal, is a question of some difficulty, but one that we need not decide. Appellate dismissal of an indictment for prosecutorial misconduct, after a conviction following a fair trial to an unbiased jury, is strong medicine. Wright does not allege prosecutorial misconduct approaching the "flagrant and unconscionable" incidents which recently led us to dismiss an indictment after a conviction in *United States v. Hogan*, 712 F.2d 757, 762 (2 Cir.1983). If the claim were to be regarded as one of selective or discriminatory prosecution, Wright's

---

**5.** The commentary adds:

> Standard 3–2.3(b) recommends that the offices of chief prosecutor and staff be full-time occupations. The commentary to that standard points out that a conflict of interest may arise from part-time devotion to the duties of public prosecutor. The instant standard complements this provision.
>
> When the possibility of a conflict of interest arises, the prosecutor should recuse himself or herself and make appropriate arrangements for the handling of the particular matter by other counsel in accordance with the principles contained in this chapter.[1] It is of the utmost importance that the prosecutor avoid participation in a case in circumstances

> where any implication of partiality may cast a shadow over the integrity of the office.
> [1] See standard 3–2.10.

**6.** As said in *People v. Zimmer*, 51 N.Y.2d 390, 395, 414 N.E.2d 705, 708, 434 N.Y.S.2d 206, 209 (1980),

> [W]hat impression could the defendant have had of the fairness of a prosecution instituted by one with the personal and financial attachments of this prosecutor? Would it have been unreasonable for the defendant—or others—to doubt that the public officer, whose burden it was to screen the complaint for frivolousness and, if necessary, guide its destiny before the Grand Jury, would do so disinterestedly?

case would clearly fail to meet the first prong of the test laid down in *United States v. Berrios*, 501 F.2d 1207, 1211 (2 Cir.1974), and probably the second as well, see *United States v. Ross*, 719 F.2d 615 (2 Cir.1983). However, the claim in fact was of something different, namely, that Wright was deprived of his entitlement to a "disinterested" prosecutor.[7] The concept is not altogether easy to define. Of course, a prosecutor need not be disinterested on the issue whether a prospective defendant has committed the crime with which he is charged. If honestly convinced of the defendant's guilt, the prosecutor is free, indeed obliged, to be deeply interested in urging that view by any fair means. See *In re Perlin*, 589 F.2d 260, 264 (7 Cir.1978). True disinterest on the issue of such a defendant's guilt is the domain of the judge and the jury—not the prosecutor. It is a bit easier to say what a disinterested prosecutor is not than what he is. He is not disinterested if he has, or is under the influence of others who have, an axe to grind against the defendant, as distinguished from the appropriate interest that members of society have in bringing a defendant to justice with respect to the crime with which he is charged. Moreover, as the New York Court of Appeals has recently said in dismissing an indictment where a part-time district attorney had been corporate counsel to and a stockholder of a corporation which the defendant was charged with defrauding, "the practical impossibility of establishing that the conflict has worked to defendant's disadvantage dictates the adoption of standards under which a reasonable potential for prejudice

will suffice." *People v. Zimmer*, 51 N.Y.2d 390, 395, 414 N.E.2d 705, 707, 434 N.Y.S.2d 206, 208 (1980). See also *People v. Superior Court of Contra Costa County*, 19 Cal.3d 255, 561 P.2d 1164, 137 Cal. Rptr. 476 (1977) (disqualifying district attorney from prosecuting charge of murder when victim's mother was in his employ and was embroiled in custody litigation with victim's ex-wife who was one of defendants).[8]

◼ Even if we were to assume *arguendo* that we would have directed dismissal of the indictment in the exercise of our supervisory power, see *United States v. Hogan, supra*, 712 F.2d at 761, 762 n. 2, if the facts now adduced by Wright had been before us on the direct appeal, it does not follow that they afford ground for relief under 28 U.S.C. § 2255. As said in *United States v. Addonizio*, 442 U.S. 178, 184–85, 99 S.Ct. 2235, 2239–40, 60 L.Ed.2d 805 (1979) (footnotes omitted):

> It has, of course, long been settled law that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment. The reasons for narrowly limiting the grounds for collateral attacks on final judgments are well-known and basic to our adversary system of justice. The question in this case is whether an error has occurred that is sufficiently fundamental to come within those narrow limits.

The Court went on to say that "unless the claim alleges a lack of jurisdiction or constitutional error, the scope of collateral attack

---

7. This phrasing seems to state the problem better than the usual reference to conflict of interest. In cases like this, where there is no basis for a claim that the prosecutor did not believe the defendant to be guilty, the claim is not that the prosecutor had an interest in opposition to his proper one in securing an indictment and a conviction; it is rather that he had an additional and impermissible reason in forwarding the prosecution.

8. We note in passing that a lesser showing may warrant disqualification of a prosecutor rather than dismissal of an indictment. See generally *United States v. Heldt*, 668 F.2d 1238, 1274–78

(D.C.Cir.1981), *cert. denied*, 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982). Indeed, we think that the degree of prosecutorial misconduct of the sort here in question and the degree of prejudice to the defendant necessary to justify action by a reviewing court steadily increase as the case goes forward, with the least being required on a motion to disqualify, somewhat more on a pretrial motion to dismiss an indictment, still more on a motion in the district court after conviction but before appeal, somewhat more on direct appeal, and as will be developed below, a good deal more on collateral attack.

has remained far more limited", *id.* at 185, 99 S.Ct. at 2240, and referred to the statement in *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962), that non-jurisdictional and non-constitutional claims are cognizable under § 2255 only if they reveal "a fundamental defect which inherently results in a complete miscarriage of justice," or "an omission inconsistent with the rudimentary demands of fair procedure," see *United States v. Addonizio, supra,* 442 U.S. at 185, 99 S.Ct. at 2240.

■ Wright's claims do not begin to measure up to the *Hill* standard for non-constitutional and non-jurisdictional error. Wright was found guilty beyond a reasonable doubt on ample evidence after a fair trial before an unbiased jury. There is no reason to question that the grand jury had sufficient evidence to support the lesser requirement of probable cause to believe that Wright had committed the crimes charged.[9] Wright's claim is rather that if Trager had accepted Druker's recommendation or even if, not accepting it, he had designated an assistant to pursue the investigation who did not have the special adverse interest attributed to Puccio, Wright would not or might not have been indicted for a crime which, as the jury's verdict demonstrates, he had in fact committed. Painful as this necessarily is to Wright, it would be going beyond all bounds to call the result "a complete miscarriage of justice" or "inconsistent with the rudimentary demands of fair procedure." *Compare Grimes v. United States,* 607 F.2d 6, 11 (2 Cir.1979) *with Azzone v. United States,* 341 F.2d 417, 418–19 (8 Cir.), *cert. denied,* 381 U.S. 943, 85 S.Ct. 1782, 14 L.Ed.2d 706 (1965).

We thus reach the question whether the existence of what we will assume to have been a special interest of Puccio's in securing Wright's indictment constituted a violation of due process, and thus a constitutional error, in the absence of evidence of specific misbehavior on Puccio's part. Here Wright understandably places great reliance on *Ganger v. Peyton,* 379 F.2d 709 (4 Cir.1967), which, under 28 U.S.C. § 2254, set aside a state conviction as a violation of due process because the prosecutor was serving two masters. Ganger was prosecuted and convicted for an assault on his wife. The prosecutor, a part-time state prosecutor, as in *People v. Zimmer, supra,* 51 N.Y.2d 390, 414 N.E.2d 705, 434 N.Y. S.2d 206, discussed above, was representing the wife in a pending divorce action based on the same assault. Ganger testified that the prosecutor offered to drop the assault charge if Ganger would make a favorable property settlement in the divorce action, and the district judge so found. The Fourth Circuit held that the prosecutor's representation of Mrs. Ganger in the divorce proceeding "suggests the strong possibility that the prosecuting attorney may have abdicated to the prosecuting witness (Ganger's wife) in the criminal case the exercise of his responsibility and discretion in making charge decisions," 379 F.2d at 713, and that this violated due process.

Whether or not we would agree that the manifest impropriety of the prosecutor's conduct in *Ganger* constituted a violation of due process, there are several distinctions between that case and Wright's. Here the decision to pursue the investigation was made by Trager, not by Puccio, and the indictment was signed by him; in order for Wright's case to be comparable with Ganger's in this respect, we would have to draw an inference that Puccio was the real instigator of the decision to proceed before a new grand jury although Wright does not even allege this and all the evidence is to the contrary.[10] Second, even

---

9. The Government had made available to Wright the grand jury testimony of the witnesses it called at trial pursuant to the Jencks Act, 18 U.S.C. § 3500. Wright does not claim that this testimony was insufficient to warrant the indictment.

10. We recognize that, as held in *Walker v. Johnston,* 312 U.S. 275, 61 S.Ct. 574, 85 L.Ed. 830 (1941), the opening qualification in 28 U.S.C. § 2255, "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief", cannot be met

**1058**

if we interpret the facts most adversely to Wright's prosecutors, they were not utilizing the criminal process to advance their own pecuniary interests, such as the prosecutor's interest in *Ganger* "that the size of his fee would be determined by what could be exacted from defendant" in the divorce case, *id.* at 713. It is argued that just as the prosecutor in *Ganger* was "attempting at once to serve two masters, the people of the Commonwealth and the wife of Ganger", *id.* at 714, Puccio was attempting to serve both the United States and his own wife. However, Mrs. Puccio's interest, unlike Mrs. Ganger's, was not a pecuniary interest in utilizing the criminal process to further her position in civil litigation but a public one in the condemnation of a man whom she thought, whether for good reasons or for bad, to have violated the public trust. Compare *Azzone v. United States, supra*, 341 F.2d at 418–19. In short, this case, with the facts taken at their worst against the Government, does not present the spectacle of a prosecutor's using the "awful instruments of the criminal law", *McNabb v. United States*, 318 U.S. 332, 343, 63 S.Ct. 608, 614, 87 L.Ed. 819 (1943) (Frankfurter, J.), for purpose of private gain and, although we consider the choice of Puccio as prosecutor to have been ill advised, we do not regard it as having deprived Wright of due process of law. At the very most, and the allegations scarcely go this far, it deprived him of the chance that, with another prosecutor, he might have undeservedly escaped indictment and consequent conviction for crimes of which he was properly found to be guilty.

Affirmed.

---

by affidavits opposing the petition, although we have said that such affidavits may be considered as showing that a petitioner's allegations are not to be deemed admitted as distinguished from showing them to be false, *see, e.g., Dalli v. United States*, 491 F.2d 758, 762 n. 4 (2 Cir.1974); *United States v. Franzese*, 525 F.2d 27, 30–31 (2 Cir.1975), *cert. denied*, 424 U.S. 921, 96 S.Ct. 1128, 47 L.Ed.2d 328 (1976). However, Trager's 1977 affidavit, in contrast to the affidavits by him and Druker in response to the § 2255 petition, does constitute part of "the files and records of the case".