# UNITED STATES PATENT AND TRADEMARK OFFICE

———

## Trademark Trial and Appeal Board

———

UMG Recordings, Inc., substituted for Universal Music Group
v.
Charles O'Rourke

———

Opposition No. 91178937
to application Serial No. 78918694
filed on June 28, 2006

———

David Donahue and Michael Chiappetta of Fross Zelnick Lehrman & Zissu, P.C. for Universal Music Group.

Lynne Petillo and Douglas J. Katich of Ansell Zaro Grimm & Aaron PC for Charles O'Rourke.

———

Before Seeherman, Rogers and Mermelstein, Administrative Trademark Judges.

Opinion by Rogers, Administrative Trademark Judge:

Applicant Charles O'Rourke seeks registration of the mark displayed below for goods identified as "Beanies; Caps; Footwear; Hats; Headbands; Headwear; Jackets; Jogging suits; Pajamas; Polo shirts; Pullovers; Short-sleeved or long-sleeved t-shirts; Shorts; Suits; Sweat pants; Sweat shirts; Swimsuits; T-shirts; Tank tops; Trunks; Underwear; Wristbands."  The application is based on applicant's claim

of use of the mark in commerce, with May 1, 2006 asserted as the date of first use and first use in commerce; and the application includes a disclaimer of exclusive right to use of the term "clothing."[1]



### *The Pleadings and Stipulations*

A notice of opposition to registration of the mark was filed variously listing as opposer Universal Music Group (in the ESTTA[2] cover sheet) and UMG Recordings, Inc. (throughout the attached statement of grounds). That pleading relies on ownership of various registrations for the mark MOTOWN, and asserted claims under Trademark Act Section 2(d) (prior registration, priority of use and likelihood of confusion,

---

[1] As shown on the original specimen of use, the mark is not a "reversal," i.e., white letters set against a black or dark background. Rather, the mark appears as light colored lettering displayed across the front of a baseball cap, with the word clothing appearing in black or darker lettering against the lighter coloring of the rest of the mark. A substitute specimen also shows the mark in colored lettering, without a rectangular background, and the word clothing in white lettering. Applicant explained that the substitute specimen is a label affixed to the goods. After it was filed, the examining attorney withdrew a refusal to register the mark on the ground that it constitutes mere ornamental matter appearing on the goods.

[2] ESTTA is the Board's electronic filing system.

hereafter, the likelihood of confusion claim) and under Section 43(c) (dilution). More specifically, opposer claims use of its MOTOWN mark for "pre-recorded audio and video tapes and cassettes, DVDs, CDs, and phonograph records featuring music and entertainment; and musical and theatrical sound and video recordings," for "clothing, footwear and headgear," and "entertainment services, promotion and distribution of musical and theatrical sound and video recordings," all beginning prior to applicant's asserted date of first use. In addition, the notice of opposition claims ownership of two registrations and three pending applications for the MOTOWN mark. The registrations are both for the word mark MOTOWN in standard character form and cover, respectively, "providing popular musical entertainment" and "restaurant services."

As for the designation of opposer, the ESTTA cover sheet listing Universal Music Group as the opposer and the statement of grounds for the opposition listing UMG Recordings, Inc. (hereinafter may be referred to as UMG) clearly are inconsistent. The statement of grounds asserts that the use of the pleaded MOTOWN marks has been by "opposer, its affiliates and its predecessors in interest (collectively, the 'UMG entities')," and the statement's signature line lists UMG Recordings, Inc., "c/o Universal Music Group." Throughout the proceeding, the ESTTA cover

sheets for the parties' respective filings have listed
Universal Music Group as the opposer, but attached
documents, including all submissions by opposer and
applicant, have listed opposer as UMG Recordings, Inc.[3]
Accordingly, we consider the parties to have agreed that UMG
Recordings, Inc. (hereafter UMG) is the opposer of record.[4]
However, in some of our references to opposer's history and
legacy in the music industry, references to opposer or to
"Motown" should be read to include the various entities
related to opposer and its predecessors in interest.[5]

In his answer applicant admitted "that the Opposer is
the owner of record" of the pleaded registrations and
applications.  Apart from this admission, applicant
effectively denied the pleaded grounds and asserted what are
denominated as affirmative defenses; but these are not true
affirmative defenses and we construe them to be mere
amplifications of applicant's denial of opposer's claims.

---

[3] After institution of a proceeding, when a party submits a
filing via ESTTA, the ESTTA cover sheet is automatically "pre-
populated" with the name of the party listed in TTABIS, the
Board's docket of electronic proceeding files.

[4] The certified copies of opposer's pleaded registrations, made
of record during trial, list UMG Recordings, Inc. as the owner.

[5] There have been many assignments involving Motown entities,
particularly as relates to copyrights and trademarks for musical
and video recordings.  There is not, however, any question raised
in this proceeding about chain of title, validity of assignments,
or the related nature of the various Motown entities that have
existed over the years.

The parties filed a stipulated agreement for protecting confidential information as well as a stipulation allowing both introduction of documents produced by the parties from their respective files as "authentic business records" and introduction of testimony by sworn declaration.

*The Record*

Opposer included in its main brief on the case a listing of evidence, which applicant did not contest; and applicant did not include his own recitation of evidence of record. Accordingly, we accept as accurate opposer's statement of the record.

The record includes declaration testimony and exhibits offered on behalf of opposer from Michael Reinert, Executive Vice President, Business & Legal Affairs of Universal Motown Records Group (an unincorporated division of UMG),[6] Lori Froeling, former Senior Vice President, Business & Legal Affairs of Universal Music Enterprises (also an unincorporated division of UMG),[7] Deanna Czapla, Retail Operations Manager and Buyer for Delaware North Companies Travel Hospitality Services, Inc. (a licensee of opposer's MOTOWN mark for clothing and other merchandise), and Mario Ortiz, a paralegal for opposer's counsel. Opposer also

---

[6] Mr. Reinert presented both main and rebuttal testimony.

[7] Ms. Froeling worked for Universal Music Enterprises at the time she provided her testimony.

filed two notices of reliance, one for the introduction of information regarding registrations, applications and other official records, and the other for introduction of certain interrogatory responses by applicant. Applicant Charles O'Rourke submitted his own testimony, and opposer then exercised its right under the parties' stipulation to conduct live cross-examination of Mr. O'Rourke. Both the direct and cross-examination testimony is of record. Finally, applicant filed a notice of reliance on opposer's interrogatory responses.

## *Questions Presented*

In its main brief (pp. 14-15), opposer lists the only question presented as whether there exists a likelihood of confusion, and we therefore consider opposer to have waived its dilution claim. Thus, to the extent opposer is correct in its allegation that applicant has conceded the fame of opposer's MOTOWN mark, applicant will be considered to have only conceded the type of fame relevant to a likelihood of confusion analysis.[8] Opposer also asserts in its brief that there is no dispute as to opposer's priority, and applicant neither contests the point in his brief nor presents any argument regarding priority. Therefore, to the extent

---

[8] *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005) (contrasts fame for likelihood of confusion analysis and for dilution analysis).

opposer relies on prior use of its mark in commerce, rather than on its registrations for the mark, we consider the question of opposer's priority to be undisputed. We do not, however, consider applicant to have specifically conceded opposer's prior use of the MOTOWN mark for clothing items.[9] We address, infra, what the record shows about such use but before commencing such analysis, we address issues relating to opposer's pleading of various registrations of, and applications seeking registration of, its MOTOWN mark.

*Opposer's Registrations, Standing*

In his brief (p. 3), applicant contends that "Opposer does not own a registered mark in the class of goods for which Applicant has applied, i.e. apparel." However, one of the applications pleaded in the notice of opposition, serial no. 77/045567, covers numerous items of footwear, headwear and clothing, for both adults and children. Such application resulted in issuance of registration no. 3550672, albeit on December 23, 2008, after applicant's brief had been filed in this case.[10] Opposer made the

---

[9] See testimony declaration of Charles O'Rourke [O'Rourke dec.] at paragraph 13: "Opposer's Mark is familiar to the baby boomer age group, and in the recording industry, not the clothing industry."

[10] The full identification for this registration is "Footwear; shoes; ties; hats; caps; jackets; scarves; shirts; visors; sweat shirts; sweat pants; sweat jackets; sweaters; t-shirts; tank tops; tops; wrist bands; and children[']s clothing, namely, infantwear, headwear, shirts, t-shirts, tank tops, cloth bibs, sweat shirts."

application of record by notice of reliance during its testimony period, as an "official record." See Trademark Rule 2.122(e). In its main brief (pp. 11-12), opposer included a request that the Board take judicial notice of any registration that might issue before issuance of a final decision in this case. In its reply brief (p. 3, n. 3), opposer noted both that the anticipated registration had issued and that applicant, in his response brief, did not object to opposer's request in its main brief that judicial notice be taken of the anticipated registration. Opposer concluded that the registration should therefore be considered of record.

After briefing was completed, opposer received from the USPTO a "status and title copy" of the registration that it had ordered promptly upon issuance of the registration.[11] That copy was filed with the Board after the completion of briefing under cover of a request that the Board take judicial notice of the registration.

The particular circumstances under which opposer pleaded its ownership of its application to register MOTOWN for various clothing items, obtained a registration after trial, and submitted a certified copy showing status and

---

[11] A "status and title copy" of an issued registration is a copy of the registration, prepared by the USPTO, which indicates the status of the registration and the last recorded owner, according to USPTO Assignment Branch records.

title after briefing are unlike those presented by other precedential decisions involving initial pleading of a pending application.  Accordingly, we address in some detail whether to consider the registration to be of record or whether we may take judicial notice of it.

As noted, the pending application was referenced in the notice of opposition and applicant admitted opposer's ownership of such.  Such an admission, however, does not dictate that the resulting registration is automatically of record whenever it should issue.  An admission obviates the need to prove the admitted allegation of fact, but no more. Thus, had a registration issued prior to trial, applicant's admission would not have excused opposer from the need to make the registration properly of record.[12]

Arguing for consideration of its registration, opposer relies in part on the fact that applicant did not object to opposer's submission of the application by notice of

---

[12] In contrast, while an opposer that pleads ownership of an application would have to make any subsequently issued registration of record, it would not have to amend its notice of opposition prior to doing so.  The pleading of the application would be viewed as having provided sufficient notice to the applicant that the opposer would rely on a registration from the application for its likelihood of confusion claim.  *Cf. Standard Knitting Ltd. v. Toyota Jidosha Kabushiki Kaisha*, 77 USPQ2d 1917, 1919-20 (TTAB 2006).  In *Standard Knitting*, the notice of opposition put applicant on notice of opposer's reliance on a pending application, and applicant later amended its counterclaim to seek cancellation of the registration that issued based on the pending application.  In contrast, when at trial opposer introduced an unpleaded registration by notice of reliance, applicant's objection to it was sustained.  *Id.*

reliance. But a copy of a pending application is admissible as an official record and could scarcely be objected to merely because it was introduced at trial. *See Life Zone Inc. v. Middleman Group Inc.*, 87 USPQ2d 1953, 1957 (TTAB 2008) (copy of opposer's pending application admissible under notice of reliance as official record).

Next, opposer argues that applicant did not object to the request in opposer's brief that the Board take judicial notice of the anticipated registration, but this argument is unavailing. First, applicant did assert in his responsive brief that opposer did not have a registration for its mark for apparel items. This must be taken as an indication that applicant viewed the introduction of the application as insufficient to make the anticipated registration of record. Second, even though applicant did not specifically object to opposer's request that the Board take judicial notice, it is well settled that the Board does not take judicial notice of USPTO records. *See Corporate Fitness Programs Inc. v. Weider Health and Fitness Inc.*, 2 USPQ2d 1682, 1683-84, n.3 (TTAB 1987) ("The Board does not take judicial notice of registrations that reside in the Patent and Trademark Office."). Given this established practice, we cannot conclude that applicant's failure to contest opposer's request constituted his agreement that the Board could take judicial notice of the anticipated issuance of a

registration. *See Edison Brothers Stores, Inc. v. Brutting E.B. Sport-International GmbH*, 230 USPQ 530, 531 n.8 (TTAB 1986)("Brutting's motion, filed after it received opposer's main brief, requesting us to make its [registration] part of the record of this proceeding is denied…. That opposer did not object is also of no consequence. A party is obviously not required to object to evidence which has not been proffered in accordance with our rules.").

Opposer's final effort to have the registration made of record was its submission, after completion of briefing, of the status and title copy that it had obtained from the USPTO, with a request that the Board take judicial notice of it. We deny the request for the reasons explained above in regard to the request for judicial notice included in opposer's brief. *See also, Jean Patou Inc. v. Theon Inc.*, 18 USPQ2d 1072, 1075 (TTAB 1990). In *Jean Patou*, during its testimony period, the opposer had put into the record a poor photocopy of a four-year old status and title copy of a pleaded registration and, one week later, but after the close of the testimony period, filed a supplemental notice of reliance with a current status and title copy prepared by the USPTO. The Board refused applicant's request to strike the timely notice of reliance, though it noted that the question of the competency of a poor photocopy of a four-year old status and title copy remained; but the Board

granted applicant's request to strike the notice of reliance submitted after the testimony period had closed. *Id.* at 1075-76.[13]

In sum, applicant's admission during pleading of opposer's ownership of its application to register the MOTOWN mark for various items of clothing did not make the resulting registration of record, and we deny each of opposer's requests that we take judicial notice of such registration. Notwithstanding that we therefore do not have this registration properly before us, because opposer properly made of record other registrations for the mark MOTOWN, it has established its standing to oppose the involved application. *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000); *see also*, *Ritchie v. Simpson,* 170 F.3d 1092, 50 USPQ2d 1023, 1025 (Fed. Cir. 1999). Moreover, opposer is entitled to rely upon the evidence it introduced to show use of the mark MOTOWN for clothing items. *Corporate Fitness*, supra, 2 USPQ2d at 1683-84 n.3. We turn, then, to consider the evidence regarding use of the parties' respective marks for clothing. We acknowledge that opposer is relying on two

---

[13] Though the opposer in *Jean Patou* also argued that its supplemental notice of reliance should be considered timely because it had requested an extension of its testimony period, the Board rejected this argument because the opposer had not requested a general extension but only an extension for the limited purpose of completing a testimony deposition. *Jean Patou*, 18 USPQ2d at 1075.

registrations of its mark for "providing popular musical entertainment" services and "restaurant services", but if the record reveals prior use by opposer of its mark(s) for clothing items, that presents the strongest case for likelihood of confusion.[14]

### *Priority of Use as to Clothing*

Applicant is entitled to rely on the filing date of his involved application, or whatever date of first use is established by the evidence of record. The filing date of the application is June 28, 2006. The application asserts that applicant first used his MTOWN and design mark on the goods listed in the application as of May 1, 2006. In their respective briefs, both parties recite these dates, but opposer refers to the asserted date of first use as "alleged" and clearly considers it subject to proof. See opposer's brief, pp. 15-16. Applicant, however, has not put any evidence in the record to substantiate the date of first use. For example, neither the O'Rourke declaration nor the transcript of the in-person cross-examination of the witness includes any discussion of the date on which applicant first began to use his mark for the identified goods.

---

[14] Nonetheless, the fame of opposer's mark in the music industry influences our decision in this case, as discussed infra, for when evidence of fame of a mark is present it is always of significance. *See Recot Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000).

The only reference to use by applicant of his mark on May 1, 2006 is the allegation of such use in the application; and it is well-settled that, although an opposed application is automatically part of the record for the opposition, the allegations contained therein are not evidence in the opposition. See Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b) ("The allegation in an application for registration … of a date of use is not evidence on behalf of the applicant [and] must be established by competent evidence."); see also, authorities discussed in TBMP section 704.04. Accordingly, the earliest date on which applicant may rely is the June 28, 2006 filing date of his application.

Opposer, in contrast, has put substantial evidence in the record establishing its use of various marks featuring a capital letter M and MOTOWN, for clothing items sold by licensees. In particular, and as noted earlier in the description of the record, opposer presented declaration testimony from Deanna Czapla, Retail Operations Manager and Buyer for a licensee of opposer who testified from her own knowledge and her review of records and documents of the licensee. Czapla dec. ¶ 2. Czapla is responsible for "the business affairs and operation of the Motown Music Review store" in the Detroit Metro Airport. Id. ¶ 1. Czapla further testified as to the parties to the original

14

licensing agreement, the subsequent change of name of the licensee, and introduced a copy of the agreement, which lists opposer as the general partner of the licensor. Czapla dec. ¶¶ 3-4, exh. 1.  The store opened in 2002 and offers for sale "an array of clothing and merchandise bearing the MOTOWN marks, including, for example, short-sleeved and long-sleeved shirts, sweatshirts, pull-overs, jackets and hats," and photographs of the store and merchandise are exhibits to the declaration.  Czapla dec. ¶¶ 5-6, exhs. 2-3.  While we cannot report the sales figures for the store because they are protected by the parties' confidentiality agreement, suffice it to say that sales since 2003 have been continuous and substantial.

In addition to the Czapla declaration, opposer also presented declaration testimony of Lori Froeling, Senior Vice President of a division of opposer, and the individual responsible for, among other activities, licensing of trademarks for the "Motown" recording label.  Froeling dec. ¶ 1.  Based on her personal knowledge or familiarity with records and documents, Froeling testified that the MOTOWN marks have been used for "a wide range of goods and services" including "clothing, headwear and footwear." Froeling dec. ¶¶ 2-3.  A licensing arrangement beginning in 1988 with the Motown Historical Museum covers the sale of clothing bearing the MOTOWN marks both in the museum gift

15

shop and on its website, www.motownmuseum.com.  Froeling

dec. ¶ 8, exhs. 18-20.  Another arrangement, beginning March

3, 1999, involves sales of MOTOWN branded clothing at the

Motown Café Orlando in Orlando, Florida.  Froeling dec. ¶ 9,

exh. 21.  And the Froeling declaration corroborates the

Czapla declaration regarding sales of licensed clothing at

the Detroit airport.  Froeling dec. ¶ 10.

All of these activities predate the filing date of

applicant's application and are sufficient to establish

opposer's priority of use of various versions of its MOTOWN

mark, some with a large uppercase M, for clothing items.  We

therefore turn to the question of likelihood of confusion.

### *Likelihood of Confusion*

The record created by opposer is substantial,

especially as it relates to the history of "Motown" records

and music and the public recognition and fame of "Motown"

recordings and performing artists.  While there are many

factors which are considered as part of the likelihood of

confusion analysis when there is evidence of record bearing

on such factors, see *In re E. I. du Pont de Nemours & Co.*,

476 F.2d 1357, 177 USPQ 563 (CCPA 1973), and *In re Majestic

Distilling Company, Inc.,* 315 F.3d 1311, 65 USPQ2d 1201

(Fed. Cir. 2003), in the case at hand the similarities in

the marks, the use of the marks for many identical items,

and the overlap in channels of trade and classes of

consumers are the most significant. *See Han Beauty, Inc. v. Alberto-Culver Co.*, 236 F.3d 1333, 57 USPQ2d 1557, 1559 (Fed. Cir. 2001) ("While it must consider each factor for which it has evidence, the Board may focus its analysis on dispositive factors, such as similarity of the marks and relatedness of the goods."). The fame of opposer's marks in the music industry also has some effect on our analysis.

Applicant seeks to register his mark for various items of clothing, headwear and footwear, as listed at the outset of this opinion. Opposer's evidence demonstrates use of opposer's MOTOWN or M MOTOWN marks for short-sleeved and long-sleeved t-shirts, sweatshirts and baseball-style caps, all items included in applicant's identification of goods. Thus, the parties' goods are in part identical and are otherwise closely related apparel items.[15] When marks are used on identical goods, the marks do not have to be as similar, to support a conclusion that confusion among consumers is likely, as they would have to be if the goods were different. *See Century 21 Real Estate Corp. v. Century Life of America*, 970 F.2d 874, 23 USPQ2d 1698, 1700 (Fed.

---

[15] Although dated after applicant's filing date, another license in the record shows that opposer has expanded into footwear by licensing its marks for use by a footwear manufacturer. See Froeling dec. ¶ 11, exhs. 22-23. While opposer has not demonstrated prior use on footwear, opposer's natural expansion into this field serves to demonstrate the relationship between the apparel items for which opposer has demonstrated its priority and footwear, which is among the items identified in applicant's identification of goods.

Cir. 1992) ("When marks would appear on virtually identical goods or services, the degree of similarity necessary to support a conclusion of likely confusion declines.").

When comparing the marks, we must consider the appearance, sound, connotation and commercial impression of each mark. *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005). Moreover, it is a well-established principle that, in articulating reasons for reaching a conclusion on the issue of likelihood of confusion, while the marks are compared in their entireties, including descriptive or disclaimed portions thereof, "there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties. Indeed, this type of analysis appears to be unavoidable." *In re National Data Corp.*, 732 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985). In the case at hand, we give little weight to the inclusion of the disclaimed word CLOTHING in applicant's mark. It is much smaller than MTOWN and would not be viewed as distinctive and an indicator of source, for it is a generic term for applicant's identified goods.

As for the appearances of the involved marks, the capital letter M is stressed in applicant's mark, because of

18

its comparatively larger size, and is distinguishable from the remainder in that the M has more rounded edges than does the word TOWN. Opposer's MOTOWN marks for clothing generally present the letters in equal size and the same font. Some displays, however, are similar to the display and font employed by applicant. See, for example, Froeling exh. 19, which shows a sweatshirt with Motown in a script form with an underscoring flourish similar to the extension of applicant's capital M under the word TOWN. The same exhibit also illustrates use of opposer's M MOTOWN mark which stresses the letter M. And the entire record shows use by opposer of various M MOTOWN marks that similarly stress a large M. While the involved marks have some differences in appearance, they also have similarities.

In comparing the pronunciation of the marks, it is a reasonable conclusion that many will articulate applicant's mark MTOWN as "EM TOWN." As for opposer's mark MOTOWN, as applicant acknowledges, consumers pronounce it as "MOW TOWN." For consumers who will speak opposer's M MOTOWN mark, it is reasonable to conclude they will articulate it as "EM MOW TOWN," but they may also refer to it as the "MOW TOWN EM." As with the appearances of the marks, the sounds of the marks have some differences but also significant similarities.

19

As for the connotations of the marks, for those who know the history of "Motown" records and performers, and the record is substantial that the "Motown" legacy and contributions to the music industry are well-known, the connotation of opposer's marks will mirror that history and legacy. In this regard, we note that opposer's licensees and franchisees not only sell MOTOWN branded clothing but utilize décor and memorabilia evocative of the legions of "Motown" artists, performers and recordings. Applicant contends (brief, p. 6) that the connotation of his mark will be distinctly different because the M in applicant's mark "is an abbreviation for the 'Middle' in 'Middletown,' New Jersey" and therefore connotes hometown pride in that place and in other towns whose names begin with the letter M. Although the record reveals that applicant has only sold clothing items in New Jersey, his identification of goods is unlimited as to classes of consumers or channels of trade or geographic scope. Because we must therefore assume that the goods will be marketed in all customary channels of trade for, and to all customary consumers for, clothing items, *see Octocom Systems, Inc. v. Houston Computers Services Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990), consumers outside applicant's hometown are unlikely to equate MTOWN with Middletown, New Jersey. Even if we accept applicant's argument that consumers who reside in or near

20

towns beginning with the letter M may associate applicant's mark with such places, consumers who do not reside in such places may view the mark as having the same connotation as opposer's marks, because of opposer's use not only of MOTOWN marks but of marks that feature a large letter M. In short, many consumers may find the marks to have the same or very similar connotations.

The overall commercial impressions of the marks is a consideration "occasionally used as a proxy for the ultimate conclusion of similarity or dissimilarity." *Palm Bay,* supra, 73 USPQ2d at 1692. In the case at hand, however, we specifically consider commercial impression as a distinct consideration when comparing the marks. Even though applicant overcame an initial refusal of registration based on the ornamental nature of the MTOWN CLOTHING mark, as shown by the original specimen of use, the fact remains that the record is replete with evidence showing that both parties' marks tend to be emblazoned across the fronts of items such as shirts and caps. Indeed, applicant essentially argues that his goods are bought to be worn as displays of hometown pride. When used in this way, the marks have very similar commercial impressions, and both are used in ways that turn a spotlight on the letter M. Overall, while the marks may have some dissimilarities as to sound or appearance, their connotations and overall

commercial impressions are likely to be the same for many consumers. *Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 62 USPQ2d 1001, 1003-04 (Fed. Cir. 2002) (holding that PACKARD TECHNOLOGIES and HEWLETT PACKARD differ in appearance and sound, but the marks convey a similar commercial impression because consumers would be aware of Hewlett-Packard's heavy involvement in technology-based goods, and therefore the marks are similar in their entireties). *See also, Ava Enterprises Inc. v. Audio Boss USA Inc.*, 77 USPQ2d 1783 (TTAB 2006) (likelihood of confusion found when stylized marks "Audio Bss USA" and "Boss Audio Systems," were used on legally identical or otherwise closely related goods, because of similarities in display of marks and overall commercial impression).

Turning to the classes of consumers and channels of trade for the involved goods, we have already noted, above, that applicant's identification is not limited and we must assume that his goods can be marketed to all customary consumers of the identified clothing, headwear and footwear items. This class of consumers would include the same class of consumers to whom opposer's identical goods are sold, i.e., any members of the general public who visit the stores or web sites of opposer's licensees or franchisees who are selling MOTOWN branded clothing at retail. Similarly, we must assume that marketing of applicant's goods can or will

22

occur in all normal channels of trade for such items. This would include retail stores featuring clothing items and sales on the internet, which, as the record shows, are means by which opposer's licensed goods are marketed. Accordingly, there is an overlap in the parties' classes of consumers and channels of trade.

The last *du Pont* factor which we consider is the fame of opposer's MOTOWN mark in the music industry, a fact which applicant has admitted. While we have already stated that we do not view applicant as having conceded the fame of opposer's mark for clothing items, we note that opposer's licensed or franchised operations may utilize décor and displays of memorabilia that draw an association between opposer's history in the music industry and the items marketed in locations such as the Motown Music Review store in the Detroit airport and the Motown Café Orlando. Opposer's mark is famous for musical recordings and performances, and opposer has demonstrated that such fame has been exploited by its use of the mark on collateral products, including clothing. *See Turner Entertainment Co. v. Nelson*, 38 USPQ2d 1942, 1944 (TTAB 1996) for a discussion of cases involving use of a famous or well-known mark on collateral products. As a result, consumers familiar with opposer's famous music industry marks, including the various MOTOWN and M MOTOWN marks, when subsequently confronted with

clothing items adorned with applicant's mark would likely conclude it was another variation on the marks used by or authorized by opposer for such goods.

Considering all the evidence of record, whether specifically discussed herein or not, and balancing all the *du Pont* factors, we conclude that there exists a likelihood of confusion among consumers.

Decision:  The opposition is sustained and registration to applicant is refused.