Paper No. 46
CEW

THIS DISPOSITION IS CITABLE AS
PRECEDENT OF THE TTAB                    JUNE 11,98

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

Hard Rock Cafe Licensing Corporation
v.
Thomas D. Elsea
_____

Opposition No. 93,436
to application Serial No. 74/309,525
filed on August 31, 1992
_____

Gerald T. Shekleton and Steven E. Feldman of Welsh & Katz
for opposer

Franklin D. Ubell of Price, Gess & Ubell for applicant
_____

Before Sams, Quinn and Walters, Administrative Trademark
Judges.

Opinion by Walters, Administrative Trademark Judge:

Hard Rock Licensing Corporation filed its opposition to

the application of Thomas D. Elsea to register the mark

shown below for "jewelry" in International Class 14;

"beverage glassware" in International Class 21; "clothing,

namely, shirts, jackets and sweatshirts" in International

Class 25; and "restaurant services and nightclub services"
in International Class 42.[1]



   As grounds for opposition, opposer asserts that
applicant's mark, when applied to applicant's goods and
services, so resembles opposer's previously used and
registered mark HARD ROCK CAFE for "T-shirts, sweatshirts,
polo shirts, sport shirts, jackets, hats, caps and belts"[2]
and marks shown below as to be likely to cause confusion
under Section 2(d) of the Trademark Act;[3]

---

[1] Application Serial No. 74/309,525, filed August 31, 1992, based upon
an allegation of a bona fide intention to use the mark in commerce in
connection with the identified goods.  The application includes a
disclaimer of "COUNTRY ROCK CAFE" and "SALOON DANCE HALL" apart from the
mark as a whole and the statement that "the stippling in the drawing is
a feature of the mark and is not intended to indicate color."

[2] Registration No. 1,504,904, issued September 20, 1988, in
International Class 25.  [Sections 8 and 15 affidavits accepted and
acknowledged, respectively.]  While opposer asserted in its notice of
opposition that this registration includes "bolo ties" and "sun visors,"
the records of the PTO indicate that these goods have been deleted from
the identification of goods in the registration.

[3] Opposer asserts, in its notice of opposition, Registration No.
1,521,050, for the mark HARD ROCK TIMES and design for "T-shirts."
However, the records of the PTO indicate that this registration has been
canceled under Section 8 of the Trademark Act.  Therefore, this
registration has been given no consideration herein.  Additionally,
opposer asserts it "also owns numerous other registrations for different
goods in connection with the marks 'HARD ROCK CAFE' and 'HARD ROCK CAFE'
and design."  As opposer was required to specifically plead any
registrations upon which it is basing its opposition, any such other
registrations have been given no consideration herein.

for "T-shirts, sweatshirts, polo shirts, sport shirts, jackets, hats, caps and belts"[4]; for "T-shirts"[5]; and for "metal key rings" and "jewelry, namely decorative pins, tie pins, lapel pins of non-precious metal"[6]; and

for "restaurant and prepared take out food services."[7] In its notice of opposition, opposer asserted, additionally, that, in view of the extensive use thereof, opposer's marks

---

[4] Registration No. 1,504,905, issued September 20, 1988, in International Class 25. [Sections 8 and 15 affidavits accepted and acknowledged, respectively.] While opposer asserted in its notice of opposition that this registration includes "bolo ties" and "sun visors," the records of the PTO indicate that these goods have been deleted from the identification of goods in the registration.

[5] Registration No. 1,408,637, issued September 9, 1986, in International Class 25. [Sections 8 and 15 affidavits accepted and acknowledged, respectively.]

[6] Registration No. 1,492,907, issued June 21, 1988, in, respectively, International Classes 6 and 14. [Sections 8 and 15 affidavits accepted and acknowledged, respectively.]

[7] Registration No. 1,398,940, issued June 24, 1986, in International Class 42. [Sections 8 and 15 affidavits accepted and acknowledged, respectively.] The registration includes a disclaimer of CAFE apart from the mark as a whole and a statement that the mark is lined for the colors brown and orange.

have become well-known in connection with its goods and services.

In his answer, applicant admitted opposer's ownership of its pleaded registrations and that opposer has been engaged in the restaurant and clothing business in the United States for many years,[8] but denied the salient allegations of the likelihood of confusion claim. Additionally, applicant asserted that he has used his mark in connection with the goods identified in the application; that the classes of customers for the parties' goods and services are not identical; and that the theme and nature of the goods and services of the parties are distinctly different.

*The Record*

There is no dispute that the record includes the pleadings and the file of the involved application. However, beyond that, the exact nature of the record in this case is strongly contested, with both parties having filed objections to specified submissions of the other party. Opposer took no testimony, but seeks to make of record, by notice of reliance, 176 exhibits comprising excerpts from periodic publications (Exhibits 1-138), press clippings and

---

[8] Specifically, applicant "stipulat[ed] upon information and belief as provided in the notice of opposition ground numbers 1 and 2 in their entirety." However, we do not consider this to be an admission with respect to the "numerous registrations" asserted by opposer which are not specifically identified, or with respect to the asserted registration which has been canceled under Section 8.

press releases (Exhibits 139-155), photocopies of its registrations (Exhibits 156-164), a demographic analysis prepared for opposer by a third party (Exhibit 165), two declarations of Robert Brown, an officer of opposer (Exhibits 166-167), and photocopies of various goods upon which opposer's marks appear (Exhibits 168-176). Applicant submitted his own testimony, with accompanying exhibits, and, by notice of reliance, excerpts from telephone directories and from *The Thomas Guide*.

With his brief, applicant filed his objections to certain of opposer's exhibits submitted by notice of reliance. The various grounds of objection included relevancy, hearsay, violation of the best evidence rule, and lack of foundation and/or authentication. Opposer responded, arguing that applicant's objections are untimely because opposer could have cured the problems if the objections had been raised during opposer's testimony period; and that there is no basis for any of applicant's objections. Opposer also objected to applicant's exhibits attached to his brief and to the alleged use by applicant of his testimony exhibits in support of the merits of applicant's argument in his brief. Applicant followed this with a motion to strike opposer's assertions that applicant's objections are untimely, to which opposer

responded with its opposition to applicant's motion to strike.

We begin by pointing out that both opposer and applicant seem to have overlooked the fact that a substantial number of opposer's proffered exhibits are not amenable to submission by notice of reliance. *See, Trademark Trial and Appeal Board Manual of Procedure (TBMP),* Sections 707 and 708, and 37 CFR 2.122(e). In particular, printed publications, which may be placed in evidence by notice of reliance, include books and periodicals available to the general public in libraries or of general circulation among members of the public or that segment of the public which is relevant to an issue in a proceeding. Printed publications do not include press releases by or on behalf of a party; press clippings, which are essentially compilations by or on behalf of a party of article titles or abstracts of, or quotes from, articles; studies prepared for a party; affidavits or declarations[9]; or product information. Thus, opposer's Exhibits 139-155[10] (press releases and clippings), Exhibit 165 (demographic analysis

---

[9] Opposer's attention is directed to 37 CFR 2.123(b) which provides, in relevant part, that by agreement of the parties, the testimony of any witness or witnesses of any party may be submitted in the form of an affidavit by such witness or witnesses. Here it is clear that applicant did not agree to the submission of testimony by opposer's officer, Robert Brown, in declaration form.

[10] While not a press release or press clipping, Exhibit 146 is an unidentified printout of a list of book titles and, as such, is not amenable to introduction into the record by notice of reliance.

prepared for opposer by a third party), Exhibits 166-167 (declarations of Robert Brown), and Exhibits 168-176 (photocopies of opposer's goods) are not properly made of record by opposer's notice of reliance and will not be considered herein.

In order to make of record by notice of reliance registrations owned by a party, the party must submit a copy of the registration prepared by the PTO showing both the current status of and current title to the registration. *See, TBMP* Section 703.02(a) and 37 CFR 2.122(d)(2). Opposer's Exhibits 156-164 are photocopies of registrations. Ordinarily, evidence submitted in connection with a motion for summary judgment is not considered in connection with the final decision in a case. *Levi Strauss & Co. v. R. Josephs Sportswear Inc*., 28 USPQ2d 1464 (TTAB 1993); *Trademark Trial and Appeal Board Manual of Procedure* (*TBMP*) Section 528.05(a). However, the photocopies of Registration Nos. 1,398,940; 1,492,907; 1,408,637; 1,504,904; and 1,504,905 (Exhibits 158-162) are considered to reference, by notice of reliance filed during opposer's testimony period, the PTO status and title copies of those registrations submitted in connection with the earlier summary judgment motion in this case. In view thereof, and due to the fact that applicant has effectively admitted opposer's ownership and the active status of these registrations, these

7

registrations are considered to be of record herein. Registration No. 1,521,050 (Exhibit 163) will not be considered because, as noted herein, the records of the PTO show that the registration has been canceled under Section 8 of the Act. Registration Nos. 1,397,180; 1,635,792; and 1,549,089 (Exhibits 156, 157 and 164) were not pleaded in the notice of opposition; applicant has made no admissions with respect to these registrations; and the record in connection with the summary judgment motion in this case contains no status and title copies of these registrations issued by the PTO. Therefore, Exhibits 156, 157 and 164 are not properly of record herein and have been given no consideration.

Before considering applicant's objections to the remaining exhibits submitted by opposer's notice of reliance (Exhibit Nos. 1-138), we address applicant's motion to strike opposer's assertions that applicant's objections are untimely. We deny applicant's motion to strike because we find it is reasonable to permit opposer to respond to applicant's objections. However, we consider applicant's objections to have been made in a timely manner.

Applicant's objections to certain specified exhibits on the ground that such exhibits are lacking in foundation because they are illegible, unidentified as to source and/or date, or in a language other than English are not considered

untimely. It is reasonable to assume that it is opposer's responsibility to review the documents it submits as evidence to ensure that such submissions meet certain basic requirements, such as that they are legible and identified as to source and date. Further, in preparing its submissions in this proceeding, we must assume that opposer is aware that it is submitting documents that are not in English. It is immaterial that applicant made these objections for the first time in his brief.

Applicant's objections on the other stated grounds, for example, hearsay and relevance, which were filed with his brief, are also considered to be timely because such objections are not of such a nature as to be curable if they had been asserted earlier.

We turn, then, to applicant's objections to opposer's remaining exhibits (Nos. 1-138), all of which are excerpts from printed publications purported to be from newspapers and periodicals, and which are proffered with opposer's notice of reliance to establish the fame of its marks. First, we overrule applicant's objections on the ground of hearsay, as opposer admits that the exhibits are not submitted for the truth of the matters asserted therein, but merely to demonstrate the alleged widespread exposure of the public to opposer's marks in the print media. Similarly, we overrule applicant's objections on the ground of relevance,

9

as such evidence is relevant to the renown of opposer's marks, although the Board will determine the weight to be given to such evidence.[11]

We overrule applicant's objections on the ground of authenticity to the extent that Fed. R. Evid. 902(6) clearly states that printed materials purporting to be newspapers or periodicals are self-authenticating. We agree with applicant that excerpts from such publications must be identified as to their source and date of publication, but we find that it is sufficient that photocopies of excerpted articles contain notations either on the copies or in the notice of reliance as to the source and date of the copied articles. However, a proffered excerpt from a newspaper or periodical is lacking in foundation and, thus, is not admissible as evidence to the extent that it is an incomplete or illegible copy, is unintelligible because it is in a language other than English, or is not fully identified as to the name and date of the published source.

---

[11] We also overrule applicant's objection to opposer's exhibits on the ground that opposer has not been shown to be the owner of any Hard Rock Cafe referenced in the exhibit articles and, thus, the references to the Hard Rock Cafes in these articles cannot inure to opposer's benefit. We find this objection to be without merit. Applicant bases its objection primarily on information contained in the articles about legal disputes between the two original founders of the London Hard Rock Cafe. However, opposer submitted the articles merely to show media references to the Hard Rock Cafe in its attempt to establish the fame of its pleaded marks, not to establish the truth of the matters asserted therein. Applicant, on the other hand, would have us rely on the truth of information contained in opposer's proffered articles to raise questions as to whether such articles do in fact refer to opposer's marks. The statements in these articles would, however, constitute hearsay. And applicant has not otherwise established that the "Hard

Thus, we sustain applicant's objections to those exhibits that are illegible or incomplete copies (Exhibit Nos. 2, 21-22, 42, 50, 53, 55-56, 61, 65-67, 68, 71-72, 78, 81-83, 90, 96-97, 117); and/or are in a language other than English (Exhibit Nos. 14-16, 23, 43, 49, 73-74, 84, 104); and/or do not indicate the name and/or date of the publication in which the excerpt appears (Exhibit Nos. 3, 6, 10, 25-27, 31-34, 37, 52, 58, 59, 62, 76-77, 85-87, 91, 93-94, 99, 102, 105).

While the alleged fame of opposer's mark is a factor to consider in relation to opposer's claim of likelihood of confusion, only the fame of opposer's mark among consumers in the United States is of relevance to us. The renown of opposer's marks outside the United States or exposure of the foreign public to opposer's marks is irrelevant. Opposer argues that foreign exposure is relevant because it is this reputation that brings tourists to its restaurants in the United States. We find this argument unpersuasive, particularly as there is no evidence in the record regarding the extent to which the customers of opposer's restaurants come from outside the United States. Therefore, we sustain applicant's objections on the ground of relevance to those exhibits that are excerpts from foreign publications or do not clearly indicate that the publications are U.S.

---

Rock Cafe" restaurants referred to in the articles are other than those

11

publications (Exhibit Nos. 4, 5, 35, 44, 47-48, 112, 116, 118-138). On the other hand, there are several excerpts from U.S. publications which discuss opposer's restaurants outside the United States (Exhibit Nos. 12-13, 38-41, 46, 75, 114). We find that these exhibits are relevant to the alleged awareness of U.S. consumers that opposer's services and sale of goods are international in scope.

We overrule applicant's objections to the remaining exhibits (Exhibit Nos. 1, 7-9, 11-13, 17-20, 24, 28-30, 36, 38-41, 45-46, 51, 54, 57, 60, 63-64, 69-70, 75, 79-80, 88-89, 92, 95, 98, 100-101, 103, 106-111, 113-115), which we find to be sufficiently clearly identified, complete and legible excerpts from publications generally available to the public in the United States.

We turn, finally, to opposer's objections, on the ground of timeliness, to three of the four exhibits applicant attached to his brief. Opposer objects also, on the ground of hearsay, to the alleged use by applicant of his testimony exhibits in support of the merits of the arguments in his brief; and, on the ground of relevance, to the phone directory listings submitted by way of applicant's notice of reliance.

Regarding the timeliness of the exhibits attached to applicant's brief, we agree with opposer that, generally,

---

owned by opposer or its related companies.

evidence submitted with a party's brief is untimely. However, Exhibit A consists of dictionary definitions of "rock," "rock-'n-roll," "hard rock," and "country music," which are amenable to judicial notice and, in this case, are relevant to our analysis of the issue of likelihood of confusion. Thus, we take judicial notice of these definitions.[12]

With respect to opposer's objections to applicant's evidence on the grounds of hearsay and relevance, we note that these objections should have been raised, at the latest, in opposer's main brief. Opposer's objections are, therefore, overruled because they are untimely. However, we have one comment with respect to opposer's objection on the ground of hearsay to applicant's alleged use, in his brief, of his exhibits in the nature of newspaper articles for the truth of the material contained therein. The record reflects that applicant's exhibits, both in connection with applicant's testimony and his notice of reliance, were not offered for the truth of their contents and, therefore, are not objectionable on the ground of hearsay. Thus, to the extent applicant's brief may rely, improperly, on the truth

---

[12] Applicant requests that we take judicial notice also of Exhibits B and C, which consist of, respectively, the Board's decision on the summary judgment motion in this case and applicant's memorandum in support of its summary judgment motion in this case. Because these two exhibits already form part of the history of this case, it is unnecessary to take judicial notice of them. However, any evidence submitted with applicant's memorandum in support of its summary judgment motion is not part of the trial evidence herein and has not been considered.

13

of the material contained in those articles, the Board has given no consideration to such arguments.

To summarize, the record consists of the pleadings; the file of the involved application; status and title copies of opposer's pleaded Registration Nos. 1,398,940; 1,492,907; 1,408,637; 1,504,904; and 1,504,905 (Opposer's Exhibits 158-162) and excerpts in the nature of articles and advertisements from printed publications (Opposer's Exhibit Nos. 1, 7-9, 11-13, 17-20, 24, 28-30, 36, 38-41, 45-46, 51, 54, 57, 60, 63-64, 69-70, 75, 79-80, 88-89, 92, 95, 98, 100-101, 103, 106-111, 113-115), all made of record by opposer's notice of reliance[13]; the testimony deposition of applicant, with accompanying exhibits; and excerpts from printed publications, made of record by applicant's notice of reliance.  Both parties filed briefs on the case.[14]

---

[13] In view of the substantial number of opposer's exhibits that we have deemed inadmissible (121 of 176 exhibits), we feel compelled to express our dismay at opposer's apparent disregard for the rules governing the presentation of evidence in proceedings before the Board and at the significant amount of time required by both parties and by the Board to consider the admissibility of opposer's 176 exhibits.  We are particularly disturbed by the fact that opposer submitted numerous illegible and/or improperly identified copies of excerpts from publications and then argued for the admissibility of these documents, claiming that applicant's objections were untimely.  We question what persuasive value opposer believed such documents would have to the Board.

[14] Opposer filed a timely request for an extension of time in which to file its reply brief, alleging that it needed additional time to respond to applicant's brief and to respond to applicant's objections to its evidence.  Opposer then filed its reply brief within the requested extension period.  Applicant opposed such an extension and moved to strike opposer's reply brief.  We find that opposer has shown good cause for the requested extension of time in which to file its reply brief. Therefore, applicant's motion to strike is denied and opposer's reply brief has been considered.

*The Parties*

From the record before us, we know only that opposer owns registrations for the mark HARD ROCK CAFE, both in typed form and in two similar design formats; that the registrations include, among them, restaurant and prepared take out food services and various clothing and jewelry items; and that articles appeared in newspapers and periodicals throughout the United States in the late 1980's and early 1990's that are about, or include references to, Hard Rock Cafe restaurants in various locations and/or Hard Rock Cafe clothing and other promotional items, especially, T-shirts. Opposer has alleged that its marks are famous, but since the articles are not presented for the truth of the material contained therein, and the record includes no other evidence bearing on the fame of opposer's marks, we cannot conclude from this record, as discussed *infra*, that opposer's marks are famous. Nor do we have a stipulation that the HARD ROCK CAFE marks are famous, as was present in *Hard Rock Cafe Licensing Corp. v. Pacific Graphics, Inc.*, 776 F.Supp. 1454, 21 USPQ2d 1368, 1370 (W.D.Wash. 1991). Further, while applicant does not appear to dispute opposer's allegations of fame, he has not admitted that opposer's marks are famous and we will not take judicial notice of fame.

15

We know from applicant's testimony that opposer operates at least one restaurant named HARD ROCK CAFE in Fashion Island, Newport Beach, California. It is applicant's opinion that this restaurant is a popular tourist attraction.

Applicant, Thomas Elsea, is the president of Country Rock Cafe, Inc. and he operates the Country Rock Cafe, Saloon and Dance Hall, which has been operating in Lake Forest, California, since October 1, 1993. The subject of this application, the COUNTRY ROCK CAFE logo, appears above the entrance to the restaurant, among other uses, and has not changed in appearance since the restaurant's opening. Mr. Elsea testified that the restaurant has grossed $3.4 million and served approximately 475,000 customers since it opened; that, since opening, $100,000 has been expended on advertising; and that, of the total spent on advertising, $75,000 has been spent on radio advertising which reaches listeners throughout Orange County, California, and the remaining $25,000 has been spent on print advertising distributed locally through its restaurant. Mr. Elsea stated that the Country Rock Cafe is advertised primarily on country music radio stations, in particular, KIK-FM radio; that during four months out of each year KIK-FM broadcasts live from applicant's restaurant on Saturday evenings; and that the restaurant has been featured in various newspapers

16

and magazines in the Orange County, California, area and in nightclub trade publications. Mr. Elsea testified that the Country Rock Cafe has a country music and dancing theme and that its clientele is not tourist-based; rather, it consists of many repeat local customers and attracts people interested in a "country" lifestyle. Consistent with this theme, in addition to offering nightly restaurant services and dancing, the Country Rock Cafe sells clothing items with the mark herein upon them, for example, T-shirts, hats, satin jackets and jeans, offers country dancing lessons, and has special family-oriented programs.

*Analysis*

Inasmuch as certified copies of opposer's pleaded registrations are of record, there is no issue with respect to opposer's priority. *King Candy Co., Inc. v. Eunice King's Kitchen, Inc*., 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).

Our determination of likelihood of confusion under Section 2(d) must be based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the likelihood of confusion issue. *In re E.I. duPont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563 (CCPA 1973).

With respect to the goods and services of the parties, we observe that there is a substantial overlap in the goods

17

and services identified in the application and in the pleaded registrations. Applicant's identified "nightclub services" are closely related to the "restaurant services" identified in opposer's Registration No. 1,398,940. Opposer's recited "take out food services" are closely related to the "restaurant services" identified in the application. The other identified goods are common promotional items in relation to the parties' services[15] and, in particular, the identified clothing items of the parties are all closely related products. Thus, we conclude that the goods and services of the parties are either identical or closely related.

Further, both opposer's and applicant's identifications of goods and services are broadly worded, without any limitations as to channels of trade or classes of purchasers. We must presume that the goods and services of the applicant and opposer are sold in all of the normal channels of trade to all of the normal purchasers for goods and services of the type identified. *See Canadian Imperial Bank v. Wells Fargo*, 811 F.2d 1490, 1 USPQ2d 1813 (Fed. Cir.

---

[15] Identifying these items as common promotional items in connection with the parties' services does not in any way imply that the goods are somehow ancillary or secondary to either party's services. We are aware that a party may receive more income from the sale of its promotional items than from its services. We are simply recognizing that the marks appearing on the goods are the names of opposer's and applicant's restaurants; that, at least with respect to applicant, these goods are sold only at applicant's restaurant; and, thus, that the goods are essentially souvenirs which promote the establishment that offers the identified services and sells the goods.

18

1987).  In other words, we conclude that the channels of trade and class of purchasers of the parties' goods and services are the same.  Applicant argues, essentially, that the parties' services are rendered to different classes of purchasers because opposer's customers are tourists and applicant's customers are local residents; applicant's and opposer's restaurants attract customers based on their respective customers' musical tastes; and hard rock music fans and country music fans are mutually exclusive.  Aside from the fact that these asserted differences are not reflected in the identifications of goods and services, we find there is no evidence in the record either to support any of these contentions or to indicate that such distinctions, if established, would necessarily lead to the conclusion that the classes of purchasers of the parties' goods and services are different.

Applicant argues, additionally, that the goods and services of the parties are "purchased with deliberation by sophisticated and discriminating purchasers and are not impulse purchases."  Applicant has presented no evidence on this point.  However, the evidence of record indicates that the parties' goods and services are likely to be purchased by ordinary consumers without special training or expertise. While ordinary consumers can be said to choose their restaurants with a certain degree of care based on their own

19

experience and the recommendations of others, we do not find this fact to warrant the conclusion, with respect to likelihood of confusion, that consumers exercise a high degree of discrimination or sophistication with regard to their decision to patronize certain eating establishments.

Turning to the marks, opposer contends that COUNTRY ROCK CAFE is the dominant portion of applicant's mark; that the HARD ROCK portion of opposer's marks and the COUNTRY ROCK portion of applicant's mark both "evoke forms of rock music . . . which suggests a relationship between the two marks in the minds of consumers"; and that the commercial impressions of the parties' marks are similar.

Applicant contends that the design element comprising the steer skull in an inverted triangle (characterized by applicant as an arrowhead) is the dominant portion of his mark and that the overall commercial impressions of the parties' marks differ; that the significance and placement of this design element highlight the word COUNTRY in applicant's mark; that the overall design of the mark also serves to separate the word COUNTRY from the other words in the mark and "contribute[s] to the commercial impression that this is a country western establishment and not one associated in any way with 'Hard Rock'"; that the dominance of the design portion of applicant's mark is further supported by the fact that applicant has disclaimed all of

20

the wording in its mark; that the HARD ROCK portion of opposer's marks connotes a particular style of rock-'n-roll music, whereas the COUNTRY portion of applicant's mark connotes an entirely different style of music; and that the words ROCK CAFE are descriptive and weak, which applicant contends is confirmed by evidence of third-party use of ROCK CAFE.

While we must base our determination on a comparison of the marks in their entireties, we are guided, equally, by the well-established principle that, in articulating reasons for reaching a conclusion on the issue of confusion, "there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties." *In re National Data Corp.,* 732 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985).

We begin our consideration of the marks before us by taking judicial notice of the following dictionary definitions[16]:

> *rock - n.* 3. rock-'n-roll. [*American Heritage Dictionary*]
>
> *rock-'n-roll* - 1. a style of popular music that derives in part from blues and folk music and is marked by a heavily accented beat and a simple, repetitive phrase structure. [*Random House*

---

[16] *The Random House Dictionary of the English Language,* unabridged (2d ed. 1987); and *The American Heritage Dictionary*, Second College Edition.

*Dictionary*]  Popular music combining elements of rhythm and blues with country and western music and having a heavily accented beat.  [*American Heritage Dictionary*]

*hard rock* - the original form of rock-'n-roll, basically dependent on a consistently loud and strong beat.  [*Random House Dictionary*]  A style of rock-'n-roll characterized by a harsh, amplified sound and frequently employing distortion, feedback, and other electronic modulations.  [*American Heritage Dictionary*]

*country* - n. 10. see country music - a style and genre of largely string-accompanied American popular music having roots in the folk music of the Southeast and cowboy music of the West . . . [*Random House Dictionary*]

*country music* - *n*. a style of popular music based on folk music of the rural United States, esp. of the southern or southwestern United States. [*American Heritage Dictionary*]

*country rock* - a style of popular music combining the features of rock-'n-roll and country music. [*Random House Dictionary*]

Considering, first, the commercial impression of opposer's marks, we find that the phrase HARD ROCK CAFE is the dominant portion of opposer's two design marks.  While lending a distinctive spare and modern appearance to opposer's marks, the design portion of opposer's marks consists principally of a background design of a circle upon which the words are superimposed in a simple script.  We find, also, that in all three of opposer's marks the words are likely to be perceived as the phrase HARD ROCK modifying the noun CAFE.  Not only does HARD ROCK appear on a single line in larger and darker script above the word CAFE in the

22

two design marks, but HARD ROCK is a unitary phrase which connotes a specific type of rock-'n-roll music.  Viewing opposer's marks in connection with the identified goods and services, we conclude that the phrase HARD ROCK CAFE is highly suggestive thereof, as consumers are likely to understand HARD ROCK CAFE as identifying an eating establishment, *i.e.*, a cafe, that either features hard rock music or has a theme pertaining to hard rock music.

Applicant contends that, in view of extensive third-party use, the phrase ROCK CAFE in opposer's marks is weak.  Opposer, in response, contends that the telephone directory listings submitted by applicant give us insufficient information from which to draw conclusions regarding third-party use and, further, that opposer is suing at least one of the third parties for trademark infringement.  We agree with applicant that the term CAFE, which is merely descriptive in connection with the parties' services, is a weak component of both parties' marks and, as evidenced by the telephone directory listings, is extensively featured in the names of third-party restaurants listed therein.  However, there is no evidence that consumers would view ROCK CAFE as a unitary phrase to the exclusion of the word preceding ROCK in either the parties' marks herein or in the names of the cafes identified in the submitted telephone directories.  We believe that the connotation of the term

23

ROCK is determined in each of these cases by the word preceding it. For example, RED ROCK, EAGLE ROCK and BLOWING ROCK are all likely to connote a geographic location. Whereas, VINTAGE ROCK and CLASSIC ROCK are likely to connote a style or category of music. Thus, these marks cannot be viewed simply as ROCK CAFE marks; rather, each mark, as with the parties' marks herein, must be viewed in its entirety. Grouping all of these marks together as "ROCK CAFE marks" ignores the sight, sound, meaning and overall commercial impressions of the marks in their entireties and is not useful to our analysis of likelihood of confusion.

Considering applicant's mark, we find that, while the words COUNTRY ROCK CAFE are prominent, the design element of applicant's mark is also a significant factor in the overall commercial impression of the mark. The skull in a triangle is prominently centered in the design and the words appear in banners intricately woven into the design. The script in which the words appear is old-fashioned in appearance. The overall appearance of the mark evokes a country and cowboy/western theme. This image is reinforced in applicant's mark by its individual elements. The words SALOON DANCE HALL, which appear in small script on a banner across the bottom of applicant's design, are reminiscent of such establishments in early towns in the western United States and are merely descriptive in connection with

24

applicant's restaurant and nightclub services.  The prominent placement of the word COUNTRY centered above the skull further reinforces the country and cowboy/western theme of the mark and of applicant's restaurant and nightclub, and is likely to be perceived as merely descriptive thereof.

At the same time, the words ROCK and CAFE, which appear below and slightly larger than the word COUNTRY in applicant's mark, but in the same script, are likely to be perceived with COUNTRY as a unitary phrase (*i.e.,* COUNTRY ROCK CAFE) with COUNTRY ROCK modifying the noun CAFE.  As music is an integral part of most nightclubs, the phrase COUNTRY ROCK is likely to be perceived as merely descriptive of the style of music featured at applicant's restaurant and nightclub.  Thus, COUNTRY ROCK CAFE is at least highly suggestive, if not merely descriptive, in connection applicant's identified goods and services as consumers are likely to understand this mark as identifying an eating establishment, *i.e.*, a cafe, that either features country and/or country rock music or has a theme pertaining thereto.

It is clear from the noted dictionary definitions that country music and rock-'n-roll music are distinct styles of music that share overlapping roots in American folk music; and that "country rock" and "hard rock" are distinct styles of country music and rock-'n-roll music, respectively.

25

While not as far apart stylistically as classical music and rock-'n-roll music, we believe there is no question that "country rock" and "hard rock" evoke quite different images for consumers in view of the distinctions between these styles of music. These distinctions in music styles are mirrored in the differences in the designs of the parties' respective marks, *i.e.,* opposer's design marks evoking a spare and modern image and applicant's mark evoking an old-fashioned cowboy/western image.

We find that the parties' marks are quite different in sight, sound and meaning and create distinctly different overall commercial impressions.

Turning to the remaining *duPont* factors, we find that opposer has not established that its mark is famous as used in connection with the identified goods and services and, thus, is entitled to a broad scope of protection. In this regard, opposer has offered a number of articles which are about or refer to opposer and were published in newspapers and periodicals over a several year period more than five years ago. While the sheer number (55) of articles of record indicates that opposer's marks are of some renown, this is insufficient to establish fame. Opposer failed to properly introduce any specific evidence regarding the nature and extent of its promotion of its mark in connection with its products and services, U.S. sales figures,

26

advertising and other promotional expenditures or evidence regarding the reputation of opposer's mark to the relevant purchasing group. In addition, opposer has not shown in even approximate terms its share of the relevant market. Thus, in view of the suggestive nature of opposer's marks, as discussed herein, we do not accord to opposer's marks a broad scope of protection as would be warranted if fame had been established in this record.[17]

Regarding other factors relevant to likelihood of confusion which were addressed by the parties, we find no evidence to support opposer's apparent contention that applicant adopted its mark with an intent to trade on opposer's reputation.

Further, regarding actual confusion or lack thereof, as the application herein is based on an allegation of a bona fide intention to use the mark in commerce and, to the extent use has actually occurred, any contemporaneous use by the parties is of relatively short duration, any conclusions drawn by the parties regarding actual confusion or lack thereof are unpersuasive herein.

In conclusion, we find that in view of the dissimilarities in the overall commercial impressions of

---

[17] Fame is but one of the duPont factors considered in determining whether a likelihood of confusion exists. In this case, even if opposer had introduced evidence sufficient to establish the fame of its mark, we would find that factor to be outweighed by the *duPont* factor regarding the similarity of the marks at issue (*see, supra*).

27

opposer's and applicant's marks, particularly in view of the highly suggestive nature of both parties' marks in

connection with their respective goods and services, no confusion is likely to exist herein.

    *Decision*:  The opposition is dismissed.

J. D. Sams

C. E. Walters
Administrative Trademark Judges,
Trademark Trial and Appeal Board

Quinn, Administrative Trademark Judge, dissenting:

I respectfully dissent from the finding of no likelihood of confusion in this case.

Before turning to the merits, I would be remiss if I did not state that I share my colleagues' dismay at opposer's disregard of the Trademark Rules of Practice pertaining to the introduction of evidence in Board inter partes proceedings.  Given the long-established trademark rules of practice and the availability of the Board's manual of procedure (*TBMP*), there should be no excuse for a party to have any of its evidence excluded for strictly procedural deficiencies.  For example, it is puzzling to me that critical facts bearing on opposer's claim of the fame of its mark (sales, extent of use, etc.) were presented by way of declarations when Trademark Rule 2.123(b) specifically provides that testimony may be submitted by affidavit **only** by agreement of the parties.  *See also TBMP* § 716; and *Hilson Research Inc. v. Society for Human Resource Management*, 27 USPQ2d 1423, 1425 at n. 8 (TTAB 1993).  From an evidentiary standpoint, even more puzzling are the illegible photocopies of articles or articles which appear in foreign languages, all of this evidence purportedly bearing on the fame of opposer's marks.

Opposer obviously is in a position to adduce a far superior record to the one present in this case (especially

30

as to fame) which failed to persuade a majority of the Board's panel. See: *Hard Rock Cafe Licensing Corp. v. Pacific Graphics Inc.,* 776 F.Supp. 1454, 21 USPQ2d 1368 (W.D.Wash. 1991)[In 1990 alone, over 3.5 million customers ate at opposer's restaurants and more than $39 million was spent by customers for food and other restaurant services at opposer's restaurants; more than $47 million of merchandise bearing the HARD ROCK CAFE mark and logo has been sold at opposer's restaurants]. Be that as it may, I now turn to give my reasons why I believe, based even on the lean record before us, that confusion between the parties' marks is likely to occur in the marketplace.

In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods and/or services. With respect to the latter consideration, it is well established that likelihood of confusion is determined based on the goods and/or services as they are identified in the involved registration(s) and application. *Canadian Imperial Bank of Commerce v. Wells Fargo Bank*, 811 F.2d 1490, 1 USPQ2d 1813 (Fed. Cir. 1987). Here, as acknowledged by the majority, there is a substantial overlap in the goods and services identified in the application and in the pleaded registrations. In point of fact, the parties' restaurant services, jewelry, shirts, jackets and sweatshirts are, for

31

purposes of the Board's analysis, legally identical. Moreover, it is clear in this case that the goods and/or services, as identified, may be purchased on impulse with nothing more than ordinary care. And, the goods and/or services would be bought by the same classes of purchasers who, because of the relatively inexpensive nature of the goods and/or services, are held to a lesser standard of purchasing care. *Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.,* 748 F.2d 669, 223 USPQ 1281, 1282 (Fed. Cir. 1984). That the goods and services are, at least in part, legally identical and are relatively inexpensive weigh heavily in opposer's favor here. When marks are applied to identical goods and/or services, "the degree of similarity [between the marks] necessary to support a conclusion of likely confusion declines." *Century 21 Real Estate Corp. v. Century Life of America*, 970 F.2d 874, 23 USPQ2d 1698, 1700 (Fed. Cir. 1992).

I find that the marks, when applied to the identical goods and/or services, engender similar overall commercial impressions. Although the marks must be compared in their entireties, there is nothing improper in giving more weight to a particular portion of a mark if it would be remembered and relied upon to identify the goods and/or services. *In re National Data Corp.*, 753 F.2d 1056, 224 USPQ 749 (Fed. Cir. 1985). Thus, inasmuch as applicant's mark comprises

both words and a design, I would accord greater weight to the words COUNTRY ROCK CAFE because the words are likely to make an impression upon purchasers that would be remembered by them and would be used by purchasers to request the goods and/or services. *In re Appetito Provisions Co.*, 3 USPQ2d 1553, 1554 (TTAB 1987); and *Kabushiki Kaisha Hattori Tokeiten v. Scuotto*, 228 USPQ 461, 462 (TTAB 1985). See also: *Giant Food, Inc. v. Nation's Food Service, Inc.*, 710 F.2d 1565, 218 USPQ 390 (Fed. Cir. 1983). This is especially the case here where the record shows that others (Elsea dep., exs. 2, 3, 4 and 5) as well as applicant in its own advertising (Elsea dep., ex. 6) refer to applicant's establishment simply as COUNTRY ROCK CAFE. Mr. Elsea also testified that his main source of advertising has been on the radio (Elsea dep., p. 8) and, of course, the listening audience hears only the words COUNTRY ROCK CAFE.

In the present case, applicant's mark is dominated by the literal portion COUNTRY ROCK CAFE which, in my considered opinion, is sufficiently close to opposer's HARD ROCK CAFE marks, that confusion is likely to occur when the marks are applied to identical, relatively inexpensive goods and/or services. In applicant's mark, the words ROCK CAFE are the ones most prominently displayed, and these words happen to be the ones shared with opposer's marks.

As shown by the dictionary definitions cited by the majority, country rock is a style of music combining country music and rock-'n-roll music; and, according to the same dictionary, hard rock is a style of rock-'n-roll.  The literal portions of both marks are identically constructed, each comprising a term describing a somewhat similar type of music (in that, according to the dictionary, both hard rock and country rock utilize rock-'n-roll) followed by the word "cafe."  Given the rising popularity of country rock music, consumers might well believe that opposer has branched out into another music-based theme restaurant wherein collateral merchandise is sold.

With respect to fame, I note the majority's recognition that "opposer's marks are of some renown."  Indeed, the evidence remaining in the record suggests that opposer and its marks have enjoyed significant unsolicited publicity, with wide exposure of the HARD ROCK CAFE marks to the consuming public.  Applicant does not appear to take issue with opposer's allegations of fame.  However, given the shortcomings of opposer's evidence, I am constrained to agree with the majority that a case of fame has not been made in this particular instance.  *Cf. Kenner Parker Toys v. Rose Art Industries*, 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992)["[F]ame of the prior mark plays a dominant role in cases featuring a famous or strong mark"].  As noted

above, opposer is in a position to have put on a much stronger showing with regards to fame. *Hard Rock Cafe Licensing Corp. v. Pacific Graphics Inc., supra*.

Although a persuasive claim of fame certainly would have made this a clearer case in opposer's favor, I nonetheless find that the renown of opposer's marks, as shown by the printed publication excerpts of record, weighs in opposer's favor. Further, applicant's record is weak relative to any third-party uses of similar marks in the restaurant field.

I note the majority's statement that "we find no evidence to support opposer's apparent contention that applicant adopted its mark with an intent to trade on opposer's reputation." I am troubled, however, by the particular way applicant chose to depict the words in his mark, and find that this presentation, coupled with applicant's knowledge of opposer's marks prior to filing the involved application, raises, at the very least, a question in my mind about applicant's good faith adoption of his mark.

More specifically, Mr. Elsea testified that prior to adopting the mark COUNTRY ROCK CAFE he was aware of, and had in fact visited, opposer's HARD ROCK CAFE located in Newport Beach, California. (Elsea dep., pp. 16, 29-30). Applicant acknowledges that applicant's establishment "is located only

35

a few miles from the Hard Rock Cafe in Newport Beach, California." (brief, p. 3) Further, applicant chose to depict the literal portion of his mark by prominently displaying the words ROCK CAFE with bordered letters in a rectangle at the center of the mark. These words appear in larger type than do the other words in the mark. The word COUNTRY appears in smaller type above the words ROCK CAFE. The words SALOON and DANCE HALL appear in even smaller type.

I think it is odd that applicant chose to separate the unitary term "COUNTRY ROCK," electing instead to place "ROCK" on the same line with the word "CAFE" and then highlighting this portion ("ROCK CAFE") of the mark. Applicant has stated that its mark "conveys the idea of a country music dance hall with a saloon." (brief, p. 6) In response, I might point out that applicant's mark emphasizes the "ROCK" portion of "COUNTRY ROCK," showing the word "ROCK" in larger letters than the word "COUNTRY." Also, contrary to applicant's statement, applicant chose to boldly highlight the words "ROCK CAFE," yet use the words "saloon" and "dance hall" in subordinate fashion. I find the record lacking in any credible explanation for this particular depiction of the words in the mark. *Roger & Gallet S.A. v. Venice Trading Co. Inc.,* 1 USPQ2d 1829 (TTAB 1987)["Where there is evidence of an applicant's intent to adopt a mark that suggests to purchasers a successful mark already in use

by another, the Board may, and ought to, take into account that intent when resolving the issue of likelihood of confusion when that issue is not free from doubt."]

Applicant, as the intent-to-use newcomer, had both the opportunity and the obligation to avoid confusion. Out of an entire universe of trademarks/service marks to choose from in naming his establishment, applicant chose, with full knowledge of opposer's marks, one which is similar to the marks previously used by opposer in connection with its establishments. As often stated, a party which knowingly adopts a mark similar to one used by another for the same goods and/or services does so at its peril. In such cases, all doubt (and I have little in this case) on the issue of likelihood of confusion must be resolved against the newcomer. See, for example: *In re Shell Oil Co*., 992 F.2d 1204, 26 USPQ2d 1687 (Fed. Cir. 1993); *Nina Ricci S.A.R.L. v. E.T.F. Enterprises Inc*., 889 F.2d 1070, 12 USPQ2d 1901 (Fed. Cir. 1989); *Kimberly Clark Corp. v. H. Douglas Enterprises, Ltd*., 774 F.2d 1144, 227 USPQ 541 (Fed. Cir. 1985); *Planters Nut & Chocolate Company v. Crown Nut Company*, Inc. 305 F.2d 916, 134 USPQ 504 (CCPA 1962); and *Gillette Canada Inc. v. Ranir Corp*., 23 USPQ2d 1768 (TTAB 1992).

So as to be clear, this is not a case where someone wanting to have a night out at the HARD ROCK CAFE will end

up at the COUNTRY ROCK CAFE.  Rather, this case presents the situation where a consumer familiar with opposer's restaurant services and collateral products sold under the HARD ROCK CAFE marks would be likely to believe, upon encountering applicant's mark COUNTRY ROCK CAFE for identical services and products, that the goods and/or services originated with or were somehow associated with or sponsored by the same entity.

For the above reasons, I would sustain the opposition.

T. J. Quinn
Administrative Trademark
Judge, Trademark Trial
and Appeal Board